IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

YOLONDA TABOR,             )     CASE NO. 1:16CV2971
                                 )
            Plaintiff,      )
                                 )     JUDGE SARA LIOI
         v.               )
                                 )     MAGISTRATE JUDGE
                               )     KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL     )
SECURITY ADMINISTRATION,   )
                               )     **REPORT AND RECOMMENDATION**
            Defendant.     )

Plaintiff Yolonda Tabor ("Tabor") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I. Procedural History

On June 10, 2013, Tabor filed applications for DIB and SSI alleging a disability onset date of April 1, 2012.  Tr. 106, 315.  She alleged disability based on the following: depression, rheumatoid arthritis in hips and knees, bi-polar and carpal tunnel syndrome in both wrists.  Tr. 332.  After denials by the state agency initially (Tr. 218, 219) and on reconsideration (Tr. 242, 243), Tabor requested an administrative hearing.  Tr. 135.  Prior to the hearing, Tabor moved to

amend her alleged onset date to March 9, 2013.  Tr. 369.  A hearing was held before

Administrative Law Judge ("ALJ") Traci M. Hixson on May 1, 2014.  Tr. 137-181.  In her

September 10, 2015, decision (Tr. 106-117), the ALJ determined that there are jobs that exist in

the national economy that Tabor can perform, i.e., she is not disabled.  Tr. 116.  Tabor requested

review of the ALJ's decision by the Appeals Council (Tr. 98-100) and, on November 1, 2016,

the Appeals Council denied review, making the ALJ's decision the final decision of the

Commissioner.  Tr. 1-4.

## II. Evidence

### A.  Personal and Vocational Evidence

Tabor was born in 1971 and was 43 years old on the dates her applications were filed.

Tr. 315.  She completed eleventh grade and has her GED.  Tr. 142.  She previously worked as a

cashier at Marc's and Dunkin' Donuts and as a bread slicer for a company that made garlic

bread.  Tr. 147-150, 170.

### B.  Relevant Medical Evidence[1]

Physical: On April 15, 2013, Tabor saw Anna Wallace, M.D., at the orthopedic hand

department at MetroHealth for an evaluation of a knot on her right wrist that caused shooting

pain up her arm.  Tr. 440.  Upon exam, she had full strength and motor skills in her right upper

extremity and no atrophy.  Tr. 442.  Dr. Wallace diagnosed likely volar ganglion cyst with

concomitant carpal tunnel syndrome, referred her for an EMG, and advised a follow up visit to

discuss surgical options for both problems.  Tr. 442.  The EMG confirmed Tabor had bilateral

carpal tunnel syndrome, moderate in her right hand and mild in her left.  Tr. 476.

---

[1]  Tabor only challenges the ALJ's medical findings regarding finger and hand impairments and her mental impairments.  Accordingly, only the medical evidence relating to those impairments are summarized and discussed herein.

On July 1, 2013, Tabor saw Kevin J. Malone, M.D., in the orthopedics department at MetroHealth.  Tr. 476.  Upon exam, Tabor had positive bilateral carpal tunnel compression tests and Tinel's sign.  Tr. 476.  She had full range of motion and no tenderness other than the cyst cite.  Tr. 476.  On July 16, Dr. Malone performed right carpal tunnel decompression surgery and excised her cyst.  Tr. 490-492.  She was to wear a splint until her follow-up visit.  Tr. 492.

At her follow-up visit with Dr. Malone on July 29, Tabor reported some ongoing pain and a right middle trigger finger which she had also had prior to the surgery but which she had not mentioned before.  Tr. 515.  Upon exam, she had right middle finger trigger with some tenderness over her A1 pulley and intact sensation and range of motion.  Tr. 515.  Dr. Malone gave her a removable wrist splint and planned to monitor the trigger finger as her hand swelling decreased.  Tr. 515.  At the next follow-up he would determine whether she was ready for left carpal tunnel release or whether the right middle finger needed more help.  Tr. 515.

On August 26, 2013, Tabor reported to Dr. Malone that her wrist felt better when wearing the splint.  Tr. 587.  She had mild palmar swelling and slight tenderness over her wound, full range of motion and intact sensation.  Tr. 587.  Dr. Malone recommended weaning off the splint. Tr. 587.

On September 10, 2013, she saw Dr. Ginley and reported that her right wrist was "improving."   Tr. 582.

On October 3, 2013, Tabor returned to Dr. Malone for a follow up visit.  Tr. 567.  Her wound had healed, she had trace swelling, full range of motion and intact sensation.  Tr. 567. She was ready to proceed with carpal tunnel surgery on her left hand.  Tr. 567.  Dr. Malone released her to use her right hand as tolerated and to use her splint as needed.  Tr. 567.  On

October 22, Dr. Malone performed a left carpal-tunnel decompression operation.  Tr. 565.  Tabor

was instructed to resume light activities four days after surgery.  Tr. 565.

On November 4, 2013, Tabor saw Dr. Malone for follow-up for her left hand.  Tr. 723.

Her wound was healed but tender, she had mild edema, full range of motion in her fingers and

thumb, and tingling in her middle finger.  Tr. 723.  Dr. Malone provided a splint and pain

medication and recommended progressive use of her left hand as tolerated.  Tr. 723.

On December 16, Tabor returned to Dr. Malone for a follow-up of her left hand.  Tr. 757.

She complained of left-thumb pain with intermittent triggering and reported having awakened

twice with clenched fists.  Tr. 757.  Upon examination, she had mild wound tenderness, minimal

edema, near full finger range of motion, thumb triggering, and intact sensation.  Tr. 757.  Tabor

declined an injection for her thumb sheath, electing instead to proceed with surgery for her

trigger thumb.  Tr. 757.

On January 7, 2014, Dr. Malone performed left thumb trigger finger release surgery.  Tr.

827-829.  At a follow-up visit on January 20, Tabor had no more left thumb triggering.  Tr. 862.

She had good range of motion in her thumb, normal sensation, and was "doing well."  Tr. 862.

She had right thumb and right middle finger triggering and tenderness over her A1 pulleys.  Tr.

862.  Dr. Malone scheduled her for trigger-finger releases on her right thumb and middle finger,

which he performed on February 18.  Tr. 897.

On March 3, 2014, Tabor returned to Dr. Malone for a follow-up visit.  Tr. 885.  Her

wound had healed, she had mild palmar swelling, near full range of motion and intact sensation.

Tr. 885.  Dr. Malone advised progressive use of her hand as tolerated.  Tr. 885.

Tabor saw Dr. Malone on April 28, 2014.  Tr. 941.  She reported some progress but

complained that she still had clicking of the middle finger with attempted flexion and swelling,

which limited her overall finger functioning.  Tr. 941.  Upon exam, she had healed incisions, mild circumferential swelling of her middle finger, and a swan-neck deformity of all her fingers of both hands, more exaggerated on the right middle finger.  Tr. 941.  Dr. Malone observed some "snapping" of the lateral bands when going from a hyperextended to a flexed posture at the PIP joint and some soft tissue crepitus over the flexor tendon sheath between the A2 and A3 pulleys region.  Tr. 941.  His impression was swan-neck deformities, multiple digits.  Tr. 941.  Tabor declined a steroid injection to help with some of the inflammation and clicking and Dr. Malone referred her to occupational therapy to work with figure-8 splints to discourage swan-neck posturing at her PIP joint and to work on progressive range of motion and swelling control.  Tr. 941.

Tabor was evaluated by occupational therapy the same day.  Tr. 937.  She was outfitted with a figure-8 splint to wear with active use of her hand.  Tr. 938.

On July 24, 2014, Tabor returned to Dr. Malone, complaining about her right middle finger.  Tr. 1010.  She reported that she had tried wearing splints but that they were uncomfortable, she was no longer wearing them, and she was interested in a more permanent solution.  Tr. 1010.  Upon exam, she had mild swelling in her middle finger, active swan deformity with PIP extension that was correctable passively, could perform full finger flexion with no triggering, and had tenderness to palpation along her flexor tendon sheath.  Tr. 1010.  Dr. Malone diagnosed her with swan-neck deformity and offered surgical repair, which Tabor agreed to.  Tr. 1010.  Dr. Malone operated on Tabor's right-middle-finger on September 2.  Tr. 992.

At a follow-up on September 8, 2014, Tabor had a healing wound, mild circumferential swelling, intact sensation, and a limited range of motion in her right middle finger due to pain and swelling.  Tr. 992.  Dr. Malone referred her to occupational therapy for a splint.  Tr. 992.

Tabor enrolled in occupational therapy.  See, e.g., Tr. 960-962.  She reported difficulties with daily activities such as cooking, cleaning and self-care.  Tr. 961.  She was given a splint and assigned home exercises.  Tr. 961.

At a follow up with Dr. Malone on October 16, 2014, Tabor reported that her pain had been improving.  Tr. 1092-1093.  Upon exam, she had mild circumferential swelling of her right middle finger and recurrence of hyperextension.  Tr. 1093.  Dr. Malone commented that she had some issues attending her therapy sessions and with compliance; significantly, her therapist noted early on that she was not wearing her splint.  Tr. 1092.  Dr. Malone recommended further therapy and a different kind of splint.  Tr. 1093.

On December 18, Tabor saw Dr. Malone for a follow-up visit.  Tr. 1042.  He remarked that Tabor had continued pain and a complete recurrence of the deformity in her right middle finger and noted that therapy was not helping and that she was not wearing her splint that day.  Tr. 1042.  He diagnosed persistent swan neck deformity, recommended a second opinion, and was considering further revision surgeries.  Tr. 1042-1043.

On December 22, 2014, Tabor saw Harry Hoyen, M.D., for a second opinion upon referral by Dr. Malone.  Tr. 1037.  Dr. Hoyen remarked that Tabor had undergone a trigger-finger release but then developed hyperextension and underwent a volar plate capsulodesis, which "helped to a certain extent."  Tr. 1037.  He observed that Tabor was wearing a "rather large" figure 8 splint and he proposed a silver-ring splint instead, which would help her function appropriately.  Tr. 1037.  He recommended further intervention after the swelling and hypersensitivity resolved and after a trial of the ring splint.  Tr. 1037-1038.

Tabor started occupational therapy on January 7, 2015, to be outfitted with a silver ring splint.  Tr. 1023.  Upon testing, she had functional range of motion throughout her bilateral upper

6

extremities except for her right middle finger.  Tr. 1023.  Her grip and pinch strength had slightly improved since November 2014 and she reported that she could better use her right hand for cooking and cleaning and that she was now able to wash dishes and her hair, although she had to use her right hand more carefully and slowly.  Tr. 1023, 1024.  She was independent with dressing herself, could use a pen or pencil with a modified grip, and still sometimes dropped things.  Tr. 1024.  Her problem list included decreased motion, swelling and pain.  Tr. 1024.

On March 2, 2015, Tabor returned to Dr. Malone for a follow-up visit.  Tr. 1160.  Dr. Malone remarked that her right-middle-finger deformity and symptoms had progressed.  Tr. 1160.  She had not been able to obtain the silver-ring splint because of insurance coverage issues and she was still occasionally wearing her former splint.  Tr. 1160.  He offered her additional surgery, "FDS tenodesis and release of lateral bands," and she agreed.  Tr. 1161.  Dr. Malone performed this surgery on March 17.  Tr. 1287.

On March 23, Tabor saw Dr. Malone for a follow-up visit.  Tr. 1277.  Her wound had healed, she had trace edema, and intact sensation.  Tr. 1277.  Dr. Malone referred her to occupational therapy.  Tr. 1278.  On April 20, Tabor reported that she was in occupational therapy but was not tolerating her splinting very well.  Tr. 1236.  She had improved extension of the finger and no evidence of hyperextension.  Tr. 1237.  Dr. Malone recommended continued therapy and noted he would try to identify alternative splinting modalities.  Tr. 1237.

On April 29, 2015, at her seventh occupational therapy session, Tabor reported that she had been compliant with wearing her splint.  Tr. 1213.  She had pain in her finger and her activities of daily living took longer.  Tr. 1215.

7

Mental: On February 21, 2013, Tabor established care with Dr. Ginley and asked for a psych referral. Tr. 392. She complained of anxiety and depression. Tr. 395. Dr. Ginley prescribed Celexa and referred her to psychiatry services. Tr. 395.

On April 19, Dr. Ginley refilled her medication and listed her as stable with treatment. Tr. 448.

On June 10 and June 25, 2013, Tabor underwent a psychiatric evaluation with psychiatric nurse practitioner Maureen Sweeney at the Centers for Families and Children. Tr. 380-387. She reported high anxiety, variable emotions, dislike of public places, low frustration tolerance, poor interpersonal relationships, anger, irritability, poor impulse control, decreased need for sleep at times, flashbacks, and nightmares. Tr. 380. Her mood most days was euthymic. Tr. 380. She reported previous psychiatric hospitalizations for suicide attempts and substance abuse. Tr. 380. She reported that her primary care physician had prescribed medication and that she had also seen a psychiatrist at MetroHealth who prescribed Risperdal. Tr. 380. Sweeney commented that, although Tabor stated that she had been diagnosed with bipolar, anxiety and depression, her medications were indicative of major depressive disorder and post-traumatic stress disorder with poor coping, rule out bipolar. Tr. 382. Because Tabor felt that the Celexa was increasing her anger and irritability, Sweeney planned to switch her to Wellbutrin. Tr. 382. Sweeney listed diagnoses of major depressive disorder, recurrent, moderate; rule out bipolar II disorder; impulse control disorder; and PTSD. Tr. 382. She assigned a Global Assessment of Functioning (GAF) scale score of 55.[2] Tr. 383.

---

[2] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See American Psychiatric Association*: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id*.

On August 2, 2013, Tabor returned to Sweeney for a follow-up.  Tr. 550.  Tabor reported continued difficulty with sleeping, racing thoughts and flashbacks, rumination about life stressors and past trauma, and seeing things out of the corner of her eye sometimes.  Tr. 550. She stated that her mood had been "pretty level."  Tr. 550.  Sweeney agreed Tabor could stop taking her antipsychotic medication Risperdal because Tabor complained of weight gain and because most of her issues appeared to be related to depression and PTSD.  Tr. 551.  Sweeney started Wellbutrin XL, discontinued Celexa, and continued Trazadone for sleep and Vistaril for anger.  Tr. 551.

On August 5, Tabor saw psychiatric nurse practitioner Tina Oney at MetroHealth for pharmacological follow-up and reported that she thought Risperdal had helped her to sleep, but that she had leg swelling.  Tr. 615.  Upon exam, she had a normal mood, affect, attention, concentration, memory, judgment and insight.  Tr. 616.  Oney assessed Tabor's mood as stable and put Tabor on Abilify for paranoia and mood stabilization.  Tr. 616.  She diagnosed her with bipolar disorder.  Tr. 617.

On August 19, Tabor returned to Sweeney and reported feeling "pretty good" but continued to have issues feeling fatigued.  Tr. 553.  She also reported ongoing anxiety and panic attacks.  Tr. 553.  She had just picked up her trazadone and Vistaril that day.  Tr. 554.  She was to meet with Amanda Bihari, her case manager, later that day to continue working through her issues.  Tr. 553.

On September 3, 2013, Tabor told Sweeney that her doctor at Metro had put her on Abilify for her nervousness.  Tr. 555.  Sweeney explained the importance of having only one mental health provider and told Tabor to choose within the next month which provider she wanted.  Tr. 555.  Tabor stated that her mood that day was "okay."  Tr. 555.

On September 10, 2013, Dr. Ginsley described Tabor's anxiety and depression as chronic, but stable.  Tr. 584.

On October 1, Tabor told Sweeney that she would discontinue mental health services at Metro.  Tr. 558.  She was depressed and irritable because she found out that her disability claim was denied and because she was told that to continue to get food stamps she would have to work or volunteer 20 hours a week.  Tr. 558.  Sweeney commented that Tabor's symptoms were exacerbated by life stressors and continued her medications.  Tr. 558.

On December 2, 2013, Tabor described her mood as "fair" and told Sweeney that she was having family issues: "they just don't understand what is going on with me."  Tr. 871.  Her case manager had set up a family meeting to discuss mental health education and Tabor's diagnoses. Tr. 871.  Sweeney wrote that she filled out paperwork excusing Tabor from work hours for food stamps.  Tr. 871.  Tabor reported that she had been diagnosed with sleep apnea and that she is going to get a CPAP machine.  Tr. 871.  She stated that she is working on trying to be more independent and described riding the bus wearing headphones because she found it difficult to deal with commotion and people, which made her cautious and nervous and which prevented her from doing her own grocery shopping.  Tr. 871.  It had gotten worse the last few years.  Tr. 871. Sweeney remarked that Tabor was making positive steps to being more independent and was making some progress overall.  Tr. 872.

Tabor saw Sweeney again January 2, 2014, for medication management and was "okay but still depressed."  Tr. 869.  She was sleeping nine hours per day but still was fatigued and was picking up her CPAP machine that day.  Tr. 869.  Her case manager Amanda Bihari had met with her family for a psycho-educational meeting and Tabor thought that it was helpful and that her family better understood her depression as a result.  Tr. 869.

On February 3, 2014, Tabor reported feeling "a little down" and that she had had a fight with her sister, but the two were able to resolve it through conversation.  Tr. 868.  Her family issues had gotten "much better" after the family meeting with Bihari.  Tr. 868.  Her sleep was better with her CPAP machine.  Tr. 868.  Sweeney commented that Tabor is "very skilled at troubleshooting anxiety-producing situations" and praised her for her coping skills.  Tr. 868.  Sweeney assessed her mood as stable but increased her Wellbutrin because she continued to have some depressive symptoms.  Tr. 868.

On March 4, Tabor told Sweeney that she had doubled her dose of Wellbutrin with another bottle that she had at home and that it had helped.  Tr. 923.  Her mood was "better."  Tr. 923.  She continued to have difficulty with hypervigilance and anxiety in public places.  Tr. 923.  Metro was the worst place she had to go, her sister was doing her grocery shopping for her, she was volunteering through CMHA (Cleveland Metropolitan Housing Authority) at her niece's after-school program, and she was trying to help out more around the house.  Tr. 923.  Sweeney increased Tabor's Wellbutrin as Tabor stated that she was less depressed on the increased dose.  Tr. 923.

On April 3, 2014, Tabor reported "up and down" mood and continuing difficulty to motivate herself to complete chores.  Tr. 921.  Her personal hygiene was "well taken care of" and she continued to volunteer at her niece's school, which she found very fulfilling.  Tr. 921.  Sweeney noted Tabor's mood continued to be depressed but related to life stressors and that medication would be unlikely to affect her mood.  Tr. 922.

On May 1, Tabor saw Sweeney for medication review and noted "things are improving."  Tr. 919.  She was trying to have better boundaries, increasing her autonomy, and being proactive in dealing with stressors.  Tr. 919.  She was in a new relationship that was an improvement from

past relationships.  Tr. 919.  She continued to be active in the afterschool program.  Tr. 919. Sweeney noted that Tabor continued to have difficulty completing her activities of daily living but that she was trying to be more proactive and autonomous.  Tr. 920.  She continued her medication.  Tr. 920.

On May 30, 2014, Tabor returned to Sweeney and reported, "things have been crazy." Tr. 954.  She had been arrested the prior month for an old drug warrant and was in jail for one week.  Tr. 954.  She was arrested while with her boyfriend, who had a history of drug trafficking, and she was thinking about moving in with him.  Tr. 955.  Sweeney expressed her concerns about this plan and remarked that Tabor's case manager had been concerned the day before when she saw Tabor because Tabor had been disheveled, tearful, and unhappy.  Tr. 955.  But Sweeney observed that day that Tabor was neat and clean and had dinner plans with her boyfriend.  Tr. 955.  Sweeney remarked that Tabor appeared to be making impulsive decisions related to her current relationship with little to no insight but that Tabor was aware of this issue.  Tr. 955.

On July 30, Tabor reported that her mood was "okay."  Tr. 951.  Sweeney and Tabor discussed Tabor's barriers to employment and Tabor identified her lack of interpersonal relationship skills as a major barrier: "I just couldn't handle dealing with people."  Tr. 951.  She had ended her relationship with her boyfriend.  Tr. 951.  She was euthymic on her medications. Tr. 952.  Sweeney planned to continue to work with her on building interpersonal relationship skills.  Tr. 952.

On August 27, 2014, Tabor saw Sweeney and she had less energy and was less put together after just waking from a nap.  Tr. 949.  Her mood was okay and her family relationship was good.  Tr. 949.  She was looking forward to helping at her niece's school again when it opened soon.  Tr. 949.  Sweeney remarked that Tabor still had a limited ability to problem-solve

and to process stressors, "often having limited insight and making impulsive decisions [which] has made holding employment difficult for [her]."  Tr. 949.

On September 29, 2014, Tabor's mood was "not up not down."  Tr. 1145.  She rated her depression 6/10.  Tr. 1145.  She said that her mood was related to her feeling stuck, having been denied her disability claim.  Tr. 1145.  She also has a prior felony conviction, mental-health issues and physical-health issues that make working difficult.  Tr. 1145.  She was discussing vocational rehabilitation with her case manager.  Tr. 1145.  Her medications helped with her mood, except in times of increased life stressors, which Sweeney stated "was to be expected." Tr. 1146.

On October 27, Tabor's mood was the same.  Tr. 1143.  She was going to try vocational rehabilitation in January if she did not hear about her disability claim.  Tr. 1143.   She had started helping out at her niece's school and displayed good boundaries when she deflected her ex-husband's attempt to rekindle their relationship.  Tr. 1143.  Sweeney assessed that Tabor's medications were helpful for her mood but that she was stagnated by life stressors, including an inability to find work due to her felony status and her disability denials.  Tr. 1144.  Tabor had good insight, was compliant on her medications and was working closely with her case manager. Tr. 1144.

On December 1, 2014, Tabor's mood was "not good."  Tr. 1141.  She had ended her relationship with a male friend because he was back with his girlfriend.  Tr. 1141.  She had also been in a fight with a neighbor in her mother's building; the police were called but Tabor was not charged because she did not start the fight.  Tr. 1141.  She was frustrated because she could not reach her counselor and Sweeney emailed the counselor telling her that Tabor was trying to get

in touch.  Tr. 1141.  Sweeney also told Tabor that she would be leaving the agency in January and helped Tabor process that information.  Tr. 1141.

On January 13, 2015, Tabor saw Kelley Kauffman at the Centers for Families and Children.  Tr. 1139.  Tabor had been spending time at a friend's house to break up monotony.  Tr. 1139.  She was not crying as much as she had been.  Tr. 1139.  She reported having had 5 surgeries on her hands recently which make it hard to work.  Tr. 1139.  She had had no physical altercations with anyone since the incident in her mother's building.  Tr. 1139.  Tabor reported minimal improvement in her depressive symptoms and that she continued to act appropriately with family and friends.  Tr. 1139.  Kauffman continued Tabor's medications.  Tr. 1139.

On March 11, Tabor saw Kauffman and reported increased stress related to her upcoming disability hearing and her mother being in rehab at a nursing home.  Tr. 1154.  She was trying to stay away from people and didn't have the energy to argue with anyone.  Tr. 1154.  She reported increased irritability and having hit her sister's friend in the face with a frying pan after he verbally disrespected her.  Tr. 1154.  Kauffman increased Tabor's Wellbutrin and continued her other medications.  Tr. 1155.

### C. Medical Opinion Evidence

#### 1. Treating Source Opinion

Mental: On July 31, 2013, Amanda J. Bihari, CPST,[3] from the Centers for Families and Children completed a Daily Activities Questionnaire.  Tr. 522-523.  She reported that she first saw Tabor on July 3, 2013, and last saw her on July 19, 2013.  Tr. 522.  She listed the following as reasons why Tabor was prevented from independent living: a history of depression, struggles with financial responsibility, and aggression.  Tr. 522.  She noted that Tabor visited with family daily, for several hours, during which time she cooked, ate, watched television and talked.  Tr.

---

[3] CPST stands for Community Psychiatric Support Treatment.

522.  She rarely visited with friends.  Tr. 522.  In the workplace, Tabor had been told multiple times that she is too aggressive and lacks proper communication skills.  Tr. 522.  She had been fired from the Hampton Inn for her emotional instability and tardiness and also had been fired from Dunkin' Donuts and Popeye's Chicken.  Tr. 522.  She commented that Tabor had a low frustration tolerance and felt overwhelmed quickly and that she was frequently depressed and unstable, resulting in tardiness, poor attendance, and apathy.  Tr. 522.  Bihari stated that Tabor was slow to complete household chores because of her hand surgery and did not shop in stores because of the stress of being around many people in public.  Tr. 523.  She did not drive or take public transportation because of stress and her sister managed her finances for her.  Tr. 523.  Bihari wrote, "Client greatly struggles to keep appointments on her own.  Client needs to be reminded the day before [and] to keep appointments."  Tr. 523.

On March 11, 2015, Bihari, M.A., filled out a medical source statement on behalf of Tabor.  Tr. 1150-1153.  She opined that Tabor was markedly limited with complex instructions and decisions and moderately limited with simple instructions and decisions.  Tr. 1150.  She could carry out simple instructions with some assistance.  Tr. 1150.  Bihari cited low frustration tolerance and becoming easily irritated, offended, overwhelmed, confused, and struggling to make appropriate judgments because of her low frustration tolerance and anger issues.  Tr. 1150.  Bihari opined that Tabor had marked limitations in interacting appropriately with the public, coworkers and supervisors and an extreme limitation in responding appropriately to usual work situations and to changes in a routine work setting because she often became easily irritated and overwhelmed and, when feeling personally targeted, can become physically aggressive.  Tr. 1151.  "She is easily triggered, as related to her trauma history."  Tr. 1151.  She struggled to tolerate daily stressors and did not tolerate constructive feedback well, often feeling personally

attacked and disrespected.  Tr. 1151.  She would be absent from work more than four days per month.  Tr. 1152.

### 2.  State Agency Reviewers

Physical: On September 7, 2013, state agency reviewing physician William Bolz, M.D., reviewed Tabor's record and opined that Tabor could perform light work, i.e., lifting twenty pounds occasionally and ten pounds frequently.  Tr. 204-205.  Dr. Bolz considered evidence to date of Tabor's bilateral carpal tunnel syndrome, ganglion cyst (post-removal) and trigger finger.  Tr. 205.  On November 26, 2013, state agency reviewing physician Esberdado Villanueva, M.D., reviewed Tabor's record, including her recent left carpal tunnel decompression surgery, and adopted Dr. Bolz's opinion.  Tr. 226-227.

Mental: On September 3, 2013, state agency reviewing psychologist Tonnie Hoyle, Psy.D., reviewed Tabor's record and adopted a prior ALJ decision finding that Tabor can perform simple routine repetitive tasks that require occasional and superficial interaction with the public or coworkers, can focus sufficiently to perform tasks involved in her assigned work for 90 percent of the day, not counting regularly scheduled breaks, can perform work that is low stress such as routine and predictable, i.e., no more than occasional changes in the work to be performed or in the work setting.  Tr. 205, 189.  On November 13, 2013, state agency reviewing psychologist Paul Tangeman, Ph.D., reviewed Tabor's record and adopted Dr. Hoyle's findings.  Tr. 227-228.

### D.  Testimonial Evidence

#### 1.  Tabor's Testimony

Tabor was represented by counsel and testified at the administrative hearing.  Tr. 140-166, 168-171.  She stated that she goes back and forth between living with her mother and her

16

sister.  Tr. 141.  Her brother dropped her off at the hearing.  Tr. 141.  She does not drive; she used to have a license but it was suspended and she never got it back.  Tr. 141-142.  She smokes about a half pack of cigarettes a day, drinks some alcohol, and uses marijuana, the last time being the week prior to the hearing.  Tr. 142.

At home, Tabor does not cook due to her surgeries; her sister has been doing all the cooking.  Tr. 142-143.  Tabor is able to put things in a microwave.  Tr. 143.  She does not wash dishes, load the dishwasher or do laundry, although she does help fold the clothes sometimes.  Tr. 143.  She cannot use a broom or vacuum cleaner but she can take out the trash if it is not too heavy.  Tr. 143.  She grabs it with her left hand.  Tr. 143.  She does not go grocery shopping; her sister does most of the shopping.  Tr. 143.  She sometimes has difficulty with her personal care doing things like washing her hair.  Tr. 143.  It depends on what phase she is in with her hand; previously, she had a hard time washing it, "period," and she learned a lot with her left hand.  Tr. 144.  She likes to listen to music, read, and watch television.  Tr. 144.  She doesn't belong to any organizations, groups or a church, but she does help sometimes as an adult supervisor with kids for CMHA, but this doesn't happen very often.  Tr. 144-145.  She occasionally gets together with family and friends and spends most of her time with her mom and sister.  Tr. 145.

On a typical day, Tabor gets up around 11:00 a.m.  Tr. 145.  She drinks some coffee with her mom, reads and sits and watches soap operas with her.  Tr. 145.  Then her sister may pick her up and she will go to her sister's house and spend time with her 10-year old niece.  Tr. 145.  Her day is otherwise occupied mostly watching television.  Tr. 146.  She naps maybe two or three days a week.  Tr. 146.  She sometimes talks on the telephone and sometimes she uses a computer to play games; she can click on the mouse with her index finger.  Tr. 146.  She may ride with her sister while her sister does errands but she does not go inside places.  Tr. 147.

Asked about things that prevent her from working, Tabor stated, "I know my mental health is a big issue." Tr. 150.  She explained that she was diagnosed in 2010 or 2011 and that she was not being treated (she had moved to and back from West Virginia) and she started getting worse. Tr. 150.  She explained that her attitude and behavior was such that she was mean all the time, aggravated, spiteful, and "putting people out." Tr. 150.  "Just it was up and down and all over the place." Tr. 150.  When she came back from West Virginia, she started getting help for the first time in her life. Tr. 150.  She discovered that she did have mental health disabilities with depression and anxiety and her counselor also told her she had PTSD. Tr. 151.  She has been going every week to see her counselor, she helps her get her medications regulated and "I just go and just I feel better." Tr. 151.  She's not as destructive. Tr. 151.  A lot of that has to do with her medication, but also being able to have somebody to talk to. Tr. 151.

Tabor also described her physical problems. Tr. 151.  She explained that she went for years without going to a doctor or taking care of herself. Tr. 151.  "Once I started actually focusing and doing what I needed to do is when I found out all the little different ailments and stuff that I've been having," for example, her trigger finger issues. Tr. 151.  Her last surgery was on her right middle finger on March 17, 2015, 45 days before the hearing. Tr. 151-152.  She has to wear a brace on it for the next three months. Tr. 157.  All told, she has had four surgeries on her right hand and two on her left. Tr. 152.  She is currently in therapy for her hand and goes twice a week. Tr. 152.  For the most part, her left hand is better after the surgeries. Tr. 152.  She still gets tingling in the tips of her fingers and occasionally drops things because she is right-handed. Tr. 152.  She is trying to work with her left hand. Tr. 153.  She had a cyst on her right wrist removed and her wrist got better afterwards, for the most part. Tr. 153.  She gets pain

every once in a while but for the most part "it's okay."  Tr. 154.  She also uses a CPAP machine to help with her sleep.  Tr. 154.

When asked how much she could lift and carry, Tabor stated that she really doesn't know; "I do my best with trying to hold stuff with my left hand, but this is not my dominant hand."  Tr. 156.  When asked whether her problem dropping things is because she doesn't feel what's in her hand or if she is unable to maintain a grip of what's in her hand, Tabor answered "Both."  Tr. 158.  She cannot take the lids off jars and bottles.  Tr. 158.  She can pick up a pen and write because she adjusted the way that she writes.  Tr. 158.

Tabor has trouble being around people; "my anxiety kicks in."  Tr. 159.  She doesn't like a lot of people in her space and when she is around others she goes over into a corner so she can see everybody.  Tr. 159.  She doesn't go into grocery stores, instead sitting in the car, because otherwise she just wants to run around and get out.  Tr. 159.  She needs reminders about taking her medicine and her appointments.  Tr. 159.  Her sister helps her out a lot with that.  Tr. 159.  Her counselor calls her the day before her appointment and comes to pick her up so she doesn't have to get on the bus.  Tr. 160.  She doesn't really use the bus and doesn't remember when she was last on a bus.  Tr. 165.  When she goes out, she sometimes has difficulty interacting with people.  Tr. 163.  When asked if she has gotten herself into trouble "with somebody saying something you shouldn't," Tabor responded "Yes," explaining that the last time that happened was one month ago when there was a big argument at her sister's house with her sister's friend.  Tr. 163-164.  "[H]e advanced on me and I whacked him with a skillet."  Tr. 164.

Tabor is able to move a gallon of milk out of the refrigerator and onto the counter.  Tr. 160.  She uses her left hand, she couldn't do this with her right hand.  Tr. 160-161.  She can do zippers, buttons and snaps on her clothing.  Tr. 161.  She can't pick up coins or small items off a

19

table, it will take her "forever." Tr. 161.  She can't lift a pot of water off the stove using both hands or open a can of soda pop.  Tr. 162.  When asked if she can lift "something heavier with just your left hand, a bag of potatoes or something," Tabor responded that it depends; sometimes she loses the sensation in her fingers so when she goes to grab stuff she doesn't feel it enough to pick it up.  Tr. 162.  She can click on her computer mouse with her right index finger playing games for about 30 minutes but has to stop because her hips hurt and she needs to get up.  Tr. 162.  She also periodically gets a pain that shoots through her hand.  Tr. 162.  She is unable to type.  Tr. 163.  She has dropped things like dishes and a jar of spaghetti sauce her sister gave her to hold when they were in the store.  Tr. 163.  When asked to clarify whether she goes into stores, Tabor stated, "Well, I don't all the time," adding, that day it was earlier and there weren't a lot of people in the store.  Tr. 163.

At times, when she has been improving through therapy, she has been able to do more things with her hands at home such as folding clothes.  Tr. 164.  During those "better times" she has been able to wash her hair, shower, and wash dishes.  Tr. 164.  But then her symptoms worsened, requiring another surgery, and she needed help to do those things at home.  Tr. 165. At the time of her hearing, she was unable to do her hair but she could shower and dress herself, although she needed help tying her shoes.  Tr. 165.  The ALJ asked Tabor how she thinks her condition has changed since the last time she was before another ALJ (in 2012).  Tr. 165.  Tabor stated that she has become a little more stable from being on her medication.  Tr. 165.  She has had the surgeries and the physical therapy.  Tr. 166.  This has all been a lot that she has had to have done and she is just doing the best she can to maintain and keep up.  Tr. 166.

## 2. Vocational Expert's Testimony

Vocational Expert Paula Zinmeister ("VE") testified at the hearing.  Tr. 166-177.  The ALJ discussed with the VE Tabor's past work as a machine bread slicer and a counter attendant. Tr. 166-172.  The ALJ asked the VE to determine whether a hypothetical individual of Tabor's age, education and work history could perform Tabor's past work or any other work if that person had the following characteristics: can lift 20 pounds occasionally and 10 pound frequently; can stand, walk and sit for six hours with a sit/stand option lasting about five minutes every hour but without leaving the workstation;  can occasionally climb ramps and stairs but never ladders, ropes or scaffolds; can occasionally stoop, kneel, crouch and crawl; can reach in all directions and frequently handle, finger and feel; must avoid hazardous conditions such as unprotected heights and moving machinery; can perform simple, routine tasks with simple, short instructions; can make simple decisions and have few workplace changes; would not be required to work in a fast-paced production quota environment and would have superficial interaction (no confrontation or negotiation) with coworkers, supervisors and the public.  Tr. 172-173.  The VE answered that such an individual could not perform Tabor's past work but could perform work as a routing clerk (70,000 national jobs, 3,000 Ohio jobs), information clerk (150,000 national jobs, 4,000 Ohio jobs) and ticket seller (1,100,000 national jobs, 40,000 Ohio jobs).  Tr. 173-174.  The ALJ asked the VE if the hypothetical individual could perform those jobs identified or any other jobs if the hypothetical individual was limited to occasional handling, fingering and feeling.  Tr. 173.  The VE replied that the hypothetical individual could still perform the job of ticket seller. Tr. 173-174.

For her third hypothetical, the ALJ asked if the VE's answer to the first hypothetical would change if the individual was limited to superficial and occasional interaction with coworkers, supervisors and the public and the VE answered that such a change would eliminate

the jobs of ticket seller and information clerk.  Tr. 174.  The ALJ asked if there would be other

jobs for such a person and the VE stated that the hypothetical individual could perform the jobs

of mail clerk (50,000 national jobs, 2,000 Ohio jobs) and could still perform the previously

identified job of routing clerk.  Tr. 175.  The ALJ asked the VE if her answer would change if

the individual would be absent from work four times per month and the VE stated that such a

limitation would preclude employment.  Tr. 175.

Tabor's attorney asked the VE whether her answer to the ALJ's third hypothetical would

change if the individual could only perform sedentary work.  Tr. 177.  The VE replied that there

would be no jobs for such an individual.  Tr. 177.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in
> the national economy . . . .

42 U.S.C. § 423(d)(2).

 In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations.  The five steps can be

summarized as follows:

1.      If claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must
        be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a
        severe impairment that has lasted or is expected to last for a continuous
        period of at least twelve months, and his impairment meets or equals a
        listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ
        must assess the claimant's residual functional capacity and use it to
        determine if claimant's impairment prevents him from doing past relevant
        work.  If claimant's impairment does not prevent him from doing his past
        relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if,
        based on his vocational factors and residual functional capacity, he is
        capable of performing other work that exists in significant numbers in the
        national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her September 10, 2015, decision, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security
        Act through June 30, 2017.  Tr. 109.

2.      The claimant has not engaged in substantial gainful activity since March
        9, 2013, the amended alleged onset date.  Tr. 109.

3.      The claimant has the following severe impairments: bipolar disorder;
        anxiety disorder; posttraumatic stress disorder; depressive disorder;

_____

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations
to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20
C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to
the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

degenerative joint disease of the left knee and bilateral hips; trigger fingers; swan neck deformity; bilateral carpal tunnel syndrome, status-post decompression; and obesity.  Tr. 109.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 109.

5.  The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she must have the option to alternate between sitting and standing every hour for 5 minutes without leaving the workstation; can occasionally climb ramps and stairs, but never climb ladders, ropes and scaffolds; can balance and occasionally stoop, kneel, crouch, and crawl; can reach in all directions; can frequently handle, finger, and feel; cannot be exposed to hazardous conditions such as unprotected heights or dangerous moving machinery; is limited to simple, routine tasks with simple, short instructions, simple decision, and few workplace changes; no fast paced production quotas; and occasional and superficial interaction (meaning no need for confrontation or negotiation) with coworkers, supervisors, and the public. Tr. 111.

6.  The claimant is unable to perform any past relevant work.  Tr. 115.

7.  The claimant was born on September 1, 1971 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 116.

8.  The claimant has at least a high school education and is able to communicate in English.  Tr. 116.

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled.  Tr. 116.

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 116.

11.  The claimant has not been under a disability, as defined in the Social Security Act, from March 9, 2013, through the date of this decision.  Tr. 117.

**V. Parties' Arguments**

Tabor objects to the ALJ's decision on two grounds: the ALJ erred in evaluating Tabor's right hand impairments and the opinion evidence regarding her mental impairments.  Doc. 13, pp. 16-21.  In response, the Commissioner submits that the ALJ did not err in her determination and her decision is supported by substantial evidence.  Doc. 16, pp. 9-15.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not err when considering Tabor's hand impairments

Tabor asserts that she underwent four surgeries on her right hand and wrist (July 2013, February 2014, September 2014, March 2015) and that, between surgeries, she was recovering and in therapy.  Doc. 13, p. 17.  She contends, "At no point during the relevant period herein did substantial evidence support a finding that Plaintiff could have performed the lifting and carrying of twenty pounds occasionally[] on a regular and continuing basis[], without the use of her right, dominant hand."  Doc. 13, pp. 17-18.  She also argues that the ALJ's citation to record evidence purporting to show functional abilities do not show such functional abilities and she identifies

25

two record citations that she claims were in error.  Doc. 13, p. 18, n. 6 (citing Tr. 1160-1161 (B19F/4-5) and Tr. 1179 (B19F/23)).

Tabor does not show that she did not have the use of her right hand for lifting or carrying. Her attorney admitted at the hearing that Tabor's carpal tunnel surgeries "largely worked" and that it has been the right middle finger that has persisted in being problematic.  Tr. 179.  Right middle finger problems do not automatically equate to the inability to use one's entire hand for lifting or carrying.  *See, e.g.*, SSR 83-10, at *6 (describing "light work" as that which may require use of arms and hands to grasp, hold and turn objects and not generally requiring the use of fingers for fine activities to the extent required as in sedentary work); *c.f.* SSR 96-9p, at *8 (describing "sedentary" work as "requir[ing] good use of both hands and fingers; e.g., to pick or pinch. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger action.").

Next, the ALJ's citations to the record were not inaccurate.  The ALJ explained,

Regarding the claimant's handling and fingering limitations, EMG testing on July 2013 shows bilateral carpal tunnel greater on the right side (B2F/87).  Records also indicate swan neck deformities of multiple digits (B12F/14).  The claimant underwent a right carpal tunnel decompression and ganglion cyst excision on July 16, 2013, but postop notes continue to show pain in the right middle finger (B2F/101-03, 126).  In October 2013, the claimant complained of left thumb triggering, and she underwent a left thumb trigger finger release on January 20, 2014 (B8F/12, 82-84).  Postoperative notes show continued symptoms in the right thumb and middle finger, but resolved symptoms in the left hand (B8F/117).  On February 18, 2014, the claimant underwent a right middle finger and right thumb trigger finger release (B10F/20-22).  She attended occupational therapy; however, records indicate that her symptoms progressed in March 1015, with swelling, tenderness at the joint, limited motion, and limited grip (B14F/1; B19F/5; B20F/2). Nevertheless, physical examinations show functional range of motion in the upper extremities, and joint range of motion and strength within functional limits in both hands except for the right middle finger (B19F/4-5; 23).  The objective medical records show that the claimant is capable of frequent handling, fingering, and feeling despite limitations associated with carpal tunnel syndrome and swan neck deformity.

Tr. 113.

The record the ALJ cited, B19F/23, shows that Tabor's range of motion and strength in her bilateral upper extremities were within functional limits except for her right middle finger. Tr. 1170 ("ROM Within functional limits throughout bilateral upper extremities except right middle finger.").  B19F/4-5 shows that Tabor had right middle finger swan neck deformity with intrinsic tightness.  Tr. 1161.  Although Tabor asserts that Tr. 1161 shows her grip strength was limited due to pain and Tr. 1179 shows reduced grip and pinch strength in her right hand as compared to her left hand, the occupational therapist found that Tabor had a range of motion and strength in both hands that were within functional limitations except for her right middle finger. In other words, the records that the ALJ cited support her statements.[5]

Although Tabor, in her reply brief, identifies additional evidence that she believes shows that she can lift no more than ten pounds and only occasionally handle, finger and feel with her right hand (Doc. 17, p. 3, n. 7), the Court does not weigh the evidence *de novo*.  *Garner*, 745 F.2d at 387.  Instead, the Court looks at whether substantial evidence supports the ALJ's decision.  The ALJ described substantial evidence supporting her decision, as detailed above; she also relied on the state agency reviewing opinions, the only opinions in the record with respect to Tabor's hand impairments.  Doc. 114.  In her reply brief Tabor complains that the state agency reviewers' opinions were assessed prior to three of her right hand surgeries.  Doc. 17, p. 3.  She admits, however, that the ALJ considered the subsequent evidence of her right hand surgeries. Doc. 17, p. 3.  There is no error when an ALJ relies upon a state agency reviewer's opinion based on an incomplete record when the ALJ independently reviews the later-dated evidence in the record.  *See McGrew v. Comm'r of Soc. Sec.*, 343 Fed. App'x 26, 32 (6th Cir. 2009).  This is especially true when, as here, the ALJ included an additional limitation in her RFC assessment

---

[5]  The undersigned observes that lifting a skillet and hitting someone in the face with it, as Tabor claims to have done in early 2015 (Tr. 164, 1154), requires a good deal of hand and wrist strength.

Case: 1:16-cv-02971-SL  Doc #: 18  Filed:  11/13/17  28 of 32.  PageID #: 1478

than the state agency reviewers opined, demonstrating that the ALJ accounted for the later evidence.  *Id*.

In her reply brief, Tabor states that the VE is responsible for determining the vocational implications of a person's limitations in lifting, carrying, handling, fingering and feeling.  Doc. 17, p. 4.  To the extent Tabor purports to find fault with the ALJ's reliance upon the VE's testimony, Tabor did not raise this issue in her opening brief, nor has she articulated it; thus, any apparent argument raised in her reply brief has been waived.  *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (issues raised for the first time in a reply brief are deemed waived and need not be considered by the court); *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

### B. The ALJ did not err in considering the opinion evidence with respect to Tabor's mental impairments

Tabor argues that the ALJ erred when she evaluated the medical opinions with respect to her mental limitations.  Doc. 13, p. 18.  She complains that the ALJ mischaracterized one of Bihari's opinions and that she erred in assigning Bihari's opinions partial and limited weight. Doc. 13, p. 21.  She also refers to an opinion purportedly advanced by Sweeney (Doc. 13, p. 20), although it is not clear whether she is raising an error with respect to Sweeney's purported opinion.

The purported opinion by Sweeney is contained in a treatment note dated December 2, 2013, wherein Sweeney wrote that she filled out paperwork excusing Tabor from work hours for food stamps.  Doc. 13, p. 20; Tr. 871.  First, as Defendant points out (and which Tabor does not dispute in her reply brief), this alleged paperwork does not appear in the record and is not even presented as an opinion.  Moreover, any opinion that Tabor is unable to work is not a medical

opinion but an issue reserved to the Commissioner.  20 C.F.R. § 404.1527(d).  And paperwork filled out for a different governmental program is not binding in social security cases.  *See Amir v. Comm'r of Soc. Sec.*, 2017 WL 4570577, at *3 (6th Cir. Oct. 13, 2017) (citing 20 C.F.R. § 404.1504).  Lastly, Sweeney allegedly filled out paperwork for Tabor's food stamp requirements before Tabor started volunteering at her niece's school, i.e., before Tabor began meeting the requirements for food stamps and obviating the need for a letter from Sweeney excusing her from these requirements.  See Tr. 558 (Tabor explaining to Sweeney that she had been told that she would have to work or volunteer 20 hours a week to get food stamps).

Bihari completed two forms on behalf of Tabor.  Her first opinion was a medical source statement dated July 31, 2013.  Tr. 522-523.  The ALJ gave this opinion "partial weight," crediting the fact that Bihari is a treating provider and her statements were generally consistent with records showing Tabor's difficulty socializing and her low energy but ultimately finding that Bihari's statements previously described by the ALJ were vague and used indefinite terms regarding the severity and limiting effects of Tabor's impairments.  Tr. 114-115.  Tabor does not challenge the ALJ's assessment of this first opinion by Bihari in her opening or reply brief.  Simply stating the fact that Bihari provided two opinions is not sufficient to present a challenge to the ALJ's decision.  Therefore, the undersigned only considers Tabor's articulated challenges to the ALJ's treatment of Bihari's second opinion.

The ALJ considered Bihari's second opinion as follows:

[O]n March 2015, treating provider Amanda Bihari, M.A., completed a medical source statement indicating that the claimant has moderate limitations in understanding and remembering simple instructions; marked limitations in understanding and remembering complex instructions, making complex decisions, interacting with the public, supervisors, and coworkers; and extreme limitations in responding appropriately to usual work situations and to changes in a routine work setting (B17F/2-3).  Ms. Bihari further indicated that the claimant is likely to be absent from work more than four days per month (B17F/4).  Partial weight is given to this statement because the evidence supports

29

the claimant's inability to handle complex instructions and decisions due to difficulty problem solving and processing stressors (B13F/2).  The claimant reports conflicts with family and her ex-boyfriend, but there is no indication of a complete inability to relate to others (B5F/3; B9F/2).  The claimant testified that she goes to physical therapy, and treatment records do not reflect an inability to respond to therapists and other providers (B7F/14; B8F/4; B20F/46).  Accordingly, the undersigned finds that any social limitations are accommodated by the above residual functional capacity, which limits the claimant to occasional and superficial interaction.  Furthermore, there is no support for Ms. Bihari's opinion that the claimant cannot follow a routine and is likely to be excessively absent, and these opinions are inconsistent with treatment records showing improved symptoms on medication and an ability to regularly participate in an after-school program (B11F/2-3).  Accordingly, limited weight is given to Ms. Bihari's opinion regarding responding appropriately to changes in routine and absenteeism.

Tr. 114.

Tabor argues that the ALJ mischaracterized Bihari's opinion because the ALJ wrote that "there is no indication of a complete inability to relate to others" but Bihari had opined that Tabor was only markedly limited in her ability to interact with others and not that she had a complete inability to interact with others.  Doc. 13, p. 21.  Tabor ignores all the other reasons the ALJ cited in her assessment of Bihari's opinion, which, the undersigned notes, are accurate and constitute substantial evidence supporting the ALJ's decision.  As for Tabor's specific complaint, it fails because the ALJ accurately described Bihari's opinion as assessing marked limitations in her ability to interact with others.  Tr. 114.  The ALJ's subsequent comment does not change that fact.[6]

The ALJ remarked that Tabor goes to physical therapy and has never been observed to be unable to respond to any of her providers.  Tr. 114.[7]  Previously in her decision, the ALJ had discussed Tabor's diagnoses, commented that some treatment notes documented diminished energy, difficulty dealing with people and poor mood but that others showed she interacted

---

[6]  Moreover, Bihari, in the narrative portion of her assessment, wrote, "[Tabor] has marked – extreme limitations in her ability to interact appropriately with the public, supervisors [and] coworkers."  Tr. 1151.

[7]  Tabor routinely attended occupational therapy at MetroHealth (see, e.g., Doc. 1023) despite describing MetroHealth as the worst public place she had to go to when discussing her anxiety in public places with Sweeney (Doc. 923).

appropriately with family and friends and remarked that she routinely felt level, stable and well. Tr. 113-114.  The ALJ observed that Tabor got better with medication and that, in May 2014, she had increased autonomy, a new relationship, and was participating in an after school program. Tr. 114.  The ALJ limited Tabor to occasional and superficial interaction, a finding that is supported by the substantial evidence detailed above, and she did not find that Bihari's opinion called for restricting Tabor further.  Tr. 114.  That Tabor disagrees with the ALJ's decision is not grounds for reversing that decision.  *See Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 477 (6th Cir. 2003) (A court defers to an agency's decision so long as substantial evidence supports the ALJ's conclusion).

In her reply brief, and in response to arguments Defendant made, Tabor challenges the citations referenced by the ALJ in her Step Three determination.  Doc. 17, p. 2.  She complains that the ALJ cited to a function report that Tabor filled out wherein she stated she had no problems getting along with family, friends, neighbors, or others but that the ALJ "omitted the fact that on the same page when asked to check the boxes of 'any of the following items that your illnesses, injuries, or conditions affect' [Tabor] checked the box titled 'Getting Along With Others.'"  Doc. 17, p. 2.[8]  Tabor does not dispute that she did, in fact, indicate on the form that she had no problems getting along with family, friends, neighbors or others.  Furthermore, the ALJ did not ignore the fact that Tabor had problems getting along with others; indeed, she found Tabor moderately limited in her ability to get along with others and, therefore, limited Tabor to occasional and superficial interaction with coworkers, supervisors and the public.  Tr. 110, 111. And Tabor's attempt to show that the ALJ erred when she wrote that Tabor spent time with her mother and sister every day (Tr. 110) because Tabor testified that she only "occasionally" visited

---

[8]  The undersigned observes that Tabor did not check the box "using hands" as an item her illnesses, injuries, or conditions affect.  Tr. 347.

with family and friends (Doc. 17, p. 2) is not well taken.  As she knows, Tabor lives with her

mother and sister.  See, e.g., Tr. 342, 141, 145.  Thus, she spent time with them every day.

Tabor merely disagrees with the ALJ's decision, which is not grounds for reversing the decision.

The ALJ's decision is supported by substantial evidence and must, therefore, be affirmed.  *Jones*,

336 F.3d at 477.

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

Dated: November 13, 2017

_____
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir.
1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).